**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EAST ST. LOUIS BRANCH NAACP, ILLINOIS STATE CONFERENCE OF THE NAACP, and UNITED CONGRESS OF COMMUNITY AND RELIGIOUS ORGANIZATIONS, <br><br> Plaintiffs, <br><br> v. <br><br> ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM J. CADIGAN, LAURA K. DONAHUE, IAN K. LINNABARY, CATHERINE S. MCCRORY, WILLIAM M. MCGUFFAGE, RICK S. TERVEN, SR., and CASANDRA B. WATSON, in their official capacities as members of the Illinois State Board of Elections, DON HARMON in his official capacity as President of the Illinois Senate, THE OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE, EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, and THE OFFICE OF THE SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **(Fourteenth and Fifteenth Amendments to the United StatesConstitution; 42 U.S.C. § 1983; 52 U.S.C. §§ 10301 and 10302)** <br><br> **Three Judge Court requested** |

## I.      INTRODUCTION

1.        Plaintiffs bring this action to enjoin the Illinois State Board of Elections and other Defendant officials from enforcing Public Act No. 102-0663 ("S.B. 927"), amending "The General Assembly Redistricting Act of 2021," insofar as it redistricts Illinois House of Representatives Districts ("House District") 112, 113 and 114.

2.        Under the existing House of Representatives redistricting plan adopted in 2011, the predominately Black community of the East St. Louis, Illinois area formed the core of House District 114. The preservation of that community of interest in House District 114 offered Black

voters in the District equal opportunities to elect their candidates of choice, resulting in the election of Black Democrats in the 2012, 2014, 2016, 2018 and 2020 elections.

3.　　　　Following the 2020 Census, House District 114 was underpopulated under the existing House of Representatives redistricting plan adopted in 2011. Despite the need to add population to meet constitutional equal population requirements, S.B. 927 removed from House District 114 approximately one-fifth of the Black Total Population ("TOT") and Black Voting Age Population ("VAP") of the East St. Louis area, replacing it with a larger White population in adjacent communities that decreased the opportunities of Black voters to elect their candidates of choice in House District 114.

4.　　　　S.B. 927 moved a portion of the Black population from House District 113 into House District 112 to make what had been a highly politically competitive district in House District 112 into a safer seat for its White Democratic incumbent. A similarly sized portion of the East St. Louis area's Black population was carved out of House District 114 and placed into House District 113 to allow House District 113 to continue to be a safe district for its White Democratic incumbent.

5.　　　　By cracking the geographically compact and politically cohesive Black community of interest in the East St. Louis area, the redistricting of House Districts 112, 113 and 114 is a racial gerrymander, enacted for the purpose of electing and protecting White Democratic incumbents in House Districts 112 and 113 at the expense of the Black voters' opportunities to elect their candidate of choice in House District 114; S.B. 927 therefore violates the United States Constitution and Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

6.　　　　For these reasons, and as further alleged in detail below, Plaintiffs respectfully pray for this Court to issue relief by issuing a declaratory judgment that S.B. 927 is unlawful as it

pertains to House Districts 112, 113 and 114 and an injunction prohibiting the Defendants from calling, holding, supervising or taking any action with respect to House of Representatives elections based on House Districts 112, 113 and 114 as they currently stand.

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to (1) 28 U.S.C. § 1343(a) and 28 U.S.C. § 1357 because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act (52 U.S.C. § 10301); and (2) 42 U.S.C. § 1983 and 28 U.S.C. § 1331, because this action arises under the Fourteenth and Fifteenth Amendments to the United States Constitution.

8.      This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

9.      Pursuant to 28 U.S.C. § 1391(b), this Court has personal jurisdiction over the Defendants because all Defendants reside in Illinois and some Defendants reside in the Northern District of Illinois. By Illinois law, the Illinois State Board of Elections is required to maintain an office in the City of Chicago. Pursuant to that requirement, the Board of Elections maintains an office at 100 West Randolph Street, Suite 14-100, Chicago, Illinois, at which the members of the Board of Elections meet and conduct business. Illinois law also requires four members of the Board of Elections to be residents of Cook County. In addition, Defendants Emanuel Christopher Welch and Don Harmon both reside in and maintain offices in the Northern District of Illinois.

10.     This case must be heard and determined by a district court of three judges pursuant to 28 U.S.C. § 2284 because this action challenges the constitutionality of the apportionment of a statewide legislative body.

### III.    PARTIES

**A.    Plaintiffs.**

11.    Plaintiff East St. Louis Branch NAACP is a non-partisan, nonprofit membership organization that was organized in 1924. Its mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. It furthers this mission primarily through public education and community advocacy, including on voting and the importance of redistricting in determining representation for the Black community. It currently has approximately 500 individual members. Its membership includes Black voters who reside in Illinois House Districts 114, 113, and 112, and Black voters who were displaced and relocated among those districts by S.B. 927. These members have suffered harm because they no longer live in a district in which they have an equal opportunity to elect candidates of their choice to the Illinois House of Representatives, and because they were subjected to race-based redistricting in violation of their constitutional rights.

12.    Plaintiff Illinois State Conference of the NAACP is a non-partisan, nonprofit membership organization that was founded on or about 1915. Its mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. It furthers this mission primarily through education and empowerment of community members, including on the importance of participation in the Census and redistricting process. It is made up of twenty-six local branches and thirteen youth councils and college chapters, which have individual members across the state including Black voters in Illinois House Districts 114, 113, and 112, and Black voters who were displaced and relocated among those districts by S.B. 927. During the current redistricting cycle, it has sponsored community workshops and town halls, assisted community members with participation in submitting public testimony,

and sent a letter to Governor Pritzker expressing concerns over the lack of engagement with the Black community in the redistricting process and the negative impact of S.B. 927 on Black representation in the Illinois General Assembly.

13.     Plaintiff United Congress of Community and Religious Organizations (UCCRO) is a non-partisan grassroots-led multiethnic and multi-faith human rights alliance mobilizing people, policy and ideals to drive societal transformation and forge unity for the equitable advancement of marginalized communities. UCCRO believes that all Illinoisans have the right to be healthy, wealthy, safe, educated and employed regardless of race, ethnicity, religion, age, income or citizenship status. UCCRO was founded in 2005 and its work has included registering and mobilizing voters, ending prison-based gerrymandering, advocating for driver's license access for undocumented community members, conducting racial equity training, and lifting up members' lived experiences to bridge divides among diverse communities of color, including Black and Brown communities. During the 2011 and 2021 redistricting cycles, UCCRO submitted Unity Map redistricting proposals that included input from Black, Latino, Asian American, and Arab American communities. UCCRO's 2021 Unity Map coalition and advocacy efforts included districts across the state, including HD 114 and the East St. Louis area. During the current redistricting cycle, UCCRO submitted oral and written testimony expressing concern about dilution of voting power of Black voters and other voters of color, educated community members about the importance of redistricting, engaged community members regarding the impact of the maps, hosted press conferences voicing frustration with the rushed and exclusionary redistricting process, and urged Governor Pritzker to veto S.B. 927.

**B.      Defendants.**

14.      Defendant Illinois State Board of Elections ("Board") has "general supervision over the administration of the registration and election laws throughout the State" pursuant to Article III, Section 5 of the Illinois Constitution. The Board is responsible for supervising the administration of the 2022 general election for the Illinois House of Representatives.

15.      Defendant William J. Cadigan is a member of the Board and is sued in his official capacity. In that capacity, Mr. Cadigan is responsible for supervision over the administration of the registration and election laws throughout Illinois. Mr. Cadigan will supervise the administration of the 2022 general election for the Illinois House of Representatives.

16.      Defendant Laura K. Donahue is a member of the Board and is sued in her official capacity. In that capacity, Ms. Donahue is responsible for supervision over the administration of the registration and election laws throughout Illinois. Ms. Donahue will supervise the administration of the 2022 general election for the Illinois House of Representatives.

17.      Defendant Ian K. Linnabary is Chair of the Board and is sued in his official capacity. In that capacity, Mr. Linnabary is responsible for supervision over the administration of the registration and election laws throughout Illinois. Mr. Linnabary will supervise the administration of the 2022 general election for the Illinois House of Representatives.

18.      Defendant Catherine S. McCrory is a member of the Board and is sued in her official capacity. In that capacity, Ms. McCrory is responsible for supervision over the administration of the registration and election laws throughout Illinois. Ms. McCrory will supervise the administration of the 2022 general election for the Illinois House of Representatives.

19.      Defendant William M. McGuffage is a member of the Board and is sued in his official capacity. In that capacity, Mr. McGuffage is responsible for supervision over the

administration of the registration and election laws throughout Illinois. Mr. McGuffage will supervise the administration of the 2022 general election for the Illinois House of Representatives.

20.     Defendant Rick S. Terven, Sr. is a member of the Board and is sued in his official capacity. In that capacity, Mr. Terven is responsible for supervision over the administration of the registration and election laws throughout Illinois. Mr. Terven will supervise the administration of the 2022 general election for the Illinois House of Representatives.

21.     Defendant Casandra B. Watson is Vice Chair of the Board and is sued in her official capacity. In that capacity, Ms. Watson is responsible for supervision over the administration of the registration and election laws throughout Illinois. Ms. Watson will supervise the administration of the 2022 general election for the Illinois House of Representatives.

22.     Defendant Don Harmon is a member of the General Assembly and is sued in his official capacity as President of the Illinois Senate.

23.     Defendant the Office of the President of the Illinois Senate is the office of the presiding officer of the Illinois Senate, as provided by Article IV, Section 6(b) of the Illinois Constitution.

24.     Defendant Emanuel Christopher Welch is a member of the General Assembly and is sued in his official capacity as Speaker of the Illinois House of Representatives.

25.     Defendant the Office of the Speaker of the Illinois House of Representatives is the office of the presiding officer of the Illinois House of Representatives, as provided by Article IV, Section 6(b) of the Illinois Constitution.

26.     Defendants Don Harmon, the Office of the President of the Illinois Senate, Emanuel Welch, and the Office of the Speaker of the Illinois House of Representatives presided over the Illinois General Assembly in the redistricting process that resulted in the passage of the

redistricting plan in S.B. 927.

27.     During all times mentioned in this Complaint, Defendants and their agents were acting under color of law, to wit: the Illinois Constitution, statutes, laws, rules, regulations, customs and usages of the State of Illinois, the Illinois General Assembly and the Illinois State Board of Elections.

## IV.     FACTS COMMON TO ALL CLAIMS

A.     **Background on Illinois' redistricting process and stated principles.**

28.     The Illinois House of Representatives is the lower house of the Illinois General Assembly. Since 1980, the Illinois House has been comprised of 118 members. Each representative is elected from a single-member district. *See* ILL. CONST. art. IV § 1.

29.     Illinois uses nesting in redistricting for its state legislative offices, providing that "[e]ach Legislative District shall be divided into two Representative Districts." ILL. CONST. art. IV § 2(b).

30.     Jurisdictions that undergo demographic changes traditionally adopt a new redistricting plan every ten years, so as to comply with the United States Constitution's "one person, one vote" requirement when new decennial census data is released.

31.     The Illinois Constitution requires that in the year following the decennial census, the General Assembly shall redistrict the Legislative Districts used to elect Senators and the Representative Districts used to elect Representatives, or alternatively through a Legislative Redistricting Commission if no redistricting plan is effective by June 30th.[1] *See* ILL. CONST. art.

---

[1]   Plaintiffs take no position on whether the initial House redistricting plan enacted by the Illinois General Assembly and signed into law by Governor J.B. Pritzker on June 4, 2021 constituted an "effective" plan as required by the Illinois Constitution.  S.B. 927 amended that plan "to incorporate the 2020 Census Public Law 94-171 population data following its release by the United States Census Bureau on August 12, 2021." ILL. PUB. ACT. NO. 102-0663 § 5(d-5) (approved Sept. 24, 2021).

IV § 3(b).

32.     The Illinois Constitution further mandates that "Representative Districts shall be compact, contiguous, and substantially equal in population." *See* ILL. CONST. art. IV § 3(a).

33.     S.B. 927 provided that certain additional criteria were to be considered for redistricting the House Districts including "to be consistent with the United States Constitution" and "with the federal Voting Rights Act, where applicable." ILL. PUB. ACT. NO. 102-0663 §§ 5(e)(2)-(3).

34.     In addition, S.B. 927 identified additional redistricting criteria to be balanced in drawing the House Districts, including "preservation of the core or boundaries of the existing districts; the preservation of communities of interest; respect for county, township, municipal, ward, and other political subdivision boundaries; [and] the maintenance of incumbent-constituent relationships…" among other principles. ILL. PUB. ACT. NO. 102-0663 § 5(f).

**B.     Black voters' opportunities to elect in House District 114 under the 2011 Plan.**

35.     House District 114 has had a Black Representative since 1975. It is the only House District in the East St. Louis area with a Black Representative.

36.     As enacted in 2011, the existing House District 114 "has large geographic areas of agricultural land and forest preserve, with a large urban center in East St. Louis." By "contain[ing] all of East St. Louis," the 2011 Plan "maintain[ed] the core of current RD 114's African American population, helping to preserve a downstate African American region in Illinois…" House Resolution 385 at 347-48 (adopted May 27, 2011), *available at* https://www.ilga.gov/legislation/97/HR/PDF/09700HR0385lv.pdf.

37.     The 2011 Plan addressed demographic changes identified in the 2010 Census by preserving the Black community of interest in House District 114: "As population has gradually drifted away from the urban areas of Belleville and East St. Louis, many residents have relocated

9

in the direction of Shiloh, Mascoutah and Lebanon. Lebanon also has an African American population, so it is logical for the community to be included in proposed RD 114 as a community of interest." House Resolution 385, *supra*, at 349.

38.     The 2011 Plan described in detail the East St. Louis area community of interest: "The socioeconomic makeup of proposed RD 114 is mostly uniform, with a large portion of the population falling into the $68,000 to $99,000 median income bracket. East St. Louis generally falls into the lowest median income bracket, $2,499 to $44,000, and some of the fringes of Belleville and O'Fallon fall into the $44,000 to $68,000 bracket. This remains essentially unchanged from current RD 114. Generally labeled as the 'Metro-East,' this area of Illinois shares the identity of a culturally and socioeconomically diverse region with common economic challenges and a strong sense of succeeding or failing together." House Resolution 385, *supra*, at 349.

39.     According to the 2010 Census data included in the 2011 Plan, House District 114 contained "a 42.04% African American voting-age population, a 1.77% Hispanic voting-age population, and a 1.33% Asian voting-age population." House Resolution 385, *supra*, at 350.

40.     Under the 2011 Plan, with the entirety of the East St. Louis community of interest included in a single district "to preserve a downstate African American region in Illinois," House District 114 provided Black voters with equal opportunities to elect their candidates of choice. House Resolution 385, *supra*, at 347.

41.     Representative Eddie Lee Jackson, Sr. was a Black Democrat.[2] He was appointed to fill the House District 114 seat in 2009.

42.     In 2010, Representative Jackson won re-election to the 114th District seat with

---

[2]   Representative Jackson passed away on December 18, 2020.

10

no opposition in the general election after defeating two candidates in the Democratic primary.

43.     In 2012, Representative Jackson ran unopposed in the Democratic primary and won re-election to the 114th District seat with 27,584 votes (59.9 percent) in the general election, defeating Ryan Stookey, a White Republican, who received 18,474 votes (40.1 percent).

44.     In 2014, Representative Jackson ran unopposed in the Democratic primary and was unchallenged in the general election, winning re-election to the 114th District seat.

45.     In 2016, the incumbent, Eddie Lee Jackson, Sr., did not run for re-election. LaToya Greenwood, a Black Democrat, ran unopposed in the Democratic primary and defeated Bob Romanik, a White Republican, in the general election. Representative Greenwood received 26,029 votes (57.2 percent) to Romanik's 19,492 votes (42.8 percent).

46.     In 2018, Representative Greenwood ran unopposed in the Democratic primary, defeating Jason Madlock, a Black Republican, in the general election. Representative Greenwood received 21,530 votes (58.3 percent) to Madlock's 15,373 votes (41.7 percent).

47.     In 2020, Representative Greenwood ran unopposed in the Democratic primary, defeating Dave Barnes, a White Republican, in the general election. Representative Greenwood received 26,682 votes (57.1 percent) to Barnes' 20,015 votes (42.9 percent).

**C.      S.B. 927 Cracks the East St. Louis Area Black Community of Interest by Removing Black Voters from House District 114.**

48.     According to the 2020 Census, the State of Illinois has a Total Population of 12,812,508.

49.     As a result of the 2020 Census, the ideally populated House District in Illinois has a Total Population of 108,581.

50.     According to the 2020 Census, under the 2011 Plan, House District 114 had a Total Population of 97,701, a deviation of 10,880 below the ideally populated House District.

51. Under the 2011 Plan, House District 114's Black VAP decreased from "a 42.04% African American voting-age population" following the 2010 Census to 37.1 percent following the 2020 Census. House Resolution 385, *supra*, at 350.

52. As the Black VAP in House District 114 decreased, it moved from having uncontested elections for Black voters' candidate of choice in 2012 and 2014 to being contested in the 2016, 2018 and 2020 elections.

53. Under the 2011 Plan, House District 113 was a reliably safe district for the White Democratic incumbent, Jay C. Hoffman, who prevailed with comfortable vote margins in every general election between 2012 and 2020: 65.6 percent in 2012; 59.5 percent in 2014; 59.1 percent in 2016; 62.9 percent in 2018; and 75.1 percent in 2020.

54. In contrast, under the 2011 Plan, House District 112 was a highly competitive district in which candidates from both the Democratic and Republican Parties won between 2012 and 2020, with elections often decided by narrow margins. In the 2012 and 2014 elections, the Republican candidate, Dwight D. Kay, won with the following margins: 50.3 percent in 2012; and 58.7 percent in 2014. From 2016 to 2020, the White Democratic candidate, Katie Stuart, won with the following margins: 51.6 percent in 2016; 55.1 percent in 2018; and 53.7 percent in 2020.

55. S.B. 927 ensured that House District 113 remained a safe seat for the White Democratic incumbent and House District 112 would become a safer seat for the White Democratic incumbent by moving Black voters from House District 114 into House District 113 to compensate for Black voters in House District 113 that were moved into House District 112.

56. Unlike the 2011 Plan, which kept the "downstate African American region in Illinois" including the East St. Louis area community of interest in the underpopulated House District 114, S.B. 927 cracked that community of interest by carving out approximately one-fifth

of the Black population in House District 114 and moving it into House District 113 to continue

to provide a safe seat for the White Democratic incumbent. House Resolution 385, *supra*, at 346-

47, 49. The removed population is in red in the figure below.

**Figure 1.  Population moved into and out of House District 114 under S.B. 927**



57.     S.B. 927 replaced the Black population moved out of House District 114 with a

predominately White population from four adjacent districts, House Districts 108, 112, 113 and

116. The population moved from those districts is reflected in the blue, green, purple and orange

areas in Figure 1, respectively.

58.     As a result of the cracking of the Black population in the East St. Louis area, the

Black Total Population of House District 114 decreased from 38 percent under the 2011 Plan to

34.6 percent under S.B. 927. Black VAP likewise decreased from 37.1 percent under the 2011

Plan to 33.4 percent under S.B. 927. See the data in Figure 2.

**Figure 2. Population moved into and out of House District 114, according to 2020 Census P.L. 94-171 data file.**

| | | TOT Population | Black TOT | White TOT | VAP | Black VAP | White VAP |
|---|---|---|---|---|---|---|---|
| **HD 114 (2011 Plan)** | | 97,701 | 37,120 | 50,685 | 73,833 | 27,361 | 40,287 |
| | | | 38.0% | 51.9% | | 37.1% | 54.6% |
| **Removed from HD 114** | To 113 | 28,614 | 7,110 | 17,687 | 21,983 | 5,236 | 14,328 |
| | | | 24.8% | 61.8% | | 23.8% | 65.2% |
| **Unchanged Core of HD 114** | | 69,087 | 30,010 | 32,998 | 51,850 | 22,125 | 25,959 |
| | | | 43.4% | 47.8% | | 42.7% | 50.1% |
| **Added to HD 114** | From 108 | 13,988 | 1,371 | 10,904 | 10,427 | 1,003 | 8,360 |
| | | | 9.8% | 78.0% | | 9.6% | 80.2% |
| | From 112 | 1,446 | 137 | 1,040 | 904 | 96 | 665 |
| | | | 9.5% | 71.9% | | 10.6% | 73.6% |
| | From 113 | 309 | 258 | 45 | 246 | 206 | 36 |
| | | | 83.5% | 14.6% | | 83.7% | 14.6% |
| | From 116 | 23,554 | 5,774 | 16,011 | 17,816 | 3,712 | 12,988 |
| | | | 24.5% | 68.0% | | 20.8% | 72.9% |
| **HD 114 (S.B. 927)** | | 108,384 | 37,550 | 60,998 | 81,243 | 27,142 | 48,008 |
| | | | 34.6% | 56.3% | | 33.4% | 59.1% |

59.     Under the 2011 Plan, House District 113 was a majority White district, with a "24.92% African American voting-age population, a 4.15% Hispanic voting-age population, and a 1.58% Asian voting-age population" following the 2010 Census. House Resolution 385, *supra*, at 346. Following the 2020 Census, the voting-age population in the district remained majority White (57.8 percent), with the Black VAP increasing to 30.4 percent.

60.     S.B. 927 moved 7,110 Black Total Population and 5,236 Black VAP from House District 114 to House District 113 to make it a safe seat for the White Democratic incumbent. Those population shifts compensated for the Black population moved from House District 113 into

14

House District 112.

61.     Under the 2011 Plan, House District 112 was "made up of primarily Caucasian residents, with small pockets of African Americans (7.2% voting-age population), Hispanic residents (3.03% voting-age population), and Asian residents (1.75% voting-age population) located throughout the district" following the 2010 Census. House Resolution 385, *supra*, at 350. Following the 2020 Census, the voting-age population in the district remained predominately White (76.9 percent), with the Black VAP increasing to 11.5 percent.

62.     S.B. 927 moved 5,531 Black Total Population and 4,182 Black VAP from House District 113 into House District 112 to make it a safer seat for the White Democratic incumbent.

63.     S.B. 927 used race as the predominant factor in cracking the Black population in the East St. Louis area in House District 114 to provide safe seats for the White Democratic incumbents in House Districts 112 and 113.

64.     In its drawing of House District 114, S.B. 927 deviates from its stated redistricting principles by cracking a politically cohesive community of Black voters in the East St. Louis area and submerging them in an adjacent district, House District 113, which is comprised of predominately White municipalities represented by a White Democratic incumbent.

65.     At the time of enactment of the 2011 Plan, House District 114 had a Black VAP of 42.04 percent. *See* House Resolution 385, *supra*, at 350. S.B. 927 reduced the Black VAP in House District 114 to 33.4 percent.

66.     The resulting House District 114 fails to provide Black voters with equal opportunities to elect their candidates of choice, in violation of the United States Constitution and Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

## V.   CAUSES OF ACTION

### COUNT I

**(42 U.S.C. § 1983 – Racial Gerrymander in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, Against All Defendants)**

67.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 to 66 above, as if fully set forth herein.

68.     Race predominated with respect to the redistricting in S.B. 927 of Illinois House District 114, where pockets of Black voters were carved out of the East St. Louis area community of interest for the purpose of maximizing safe seats for White Democratic incumbents in House Districts 112 and 113, minimizing the opportunity of Black voters to participate effectively in the political process in House District 114 and to be able to elect their candidate of choice.

69.     The predominance of Defendants' racial purpose is demonstrated by the reduction in S.B. 927 of the Black Total Population and Black VAP in House District 114, which had been performing as an effective district affording Black voters an equal opportunity to elect their candidates of choice under the 2011 Plan and in taking out one fifth of the Black population in a district that was already underpopulated.

70.     The controlling principle applied in S.B. 927's drawing of House Districts 112, 113 and 114 was to remove Black voters from House District 114 into House District 113 to compensate for the loss of Black voters moved from House District 113 into House District 112.

71.     In this context, the reduction of the Black population percentage constitutes "'persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale.'" *Bethune-Hill v. Virginia State Bd. of Elecs.*, 137 S.Ct. 788, 798 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 913 (1995)).

72.     The racial gerrymandering of House District 114 by S.B. 927 violates the rights

16

of Plaintiffs guaranteed to them by the Fourteenth and Fifteenth Amendment to the U.S. Constitution. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

73.     By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

## COUNT II

**(52 U.S.C. § 10301 – Vote Dilution in Violation of Section 2 of the Voting Rights Act, Against All Defendants)**

74.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 to 73 above, as if fully set forth herein.

75.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 of the Voting Rights Act prohibits vote dilution. A violation of Section 2 is established if it is shown that, "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

76.     The dilution of Black voting strength "may be caused by the dispersal of [B]lacks into districts in which they constitute an ineffective minority of voters or from the concentration of [B]lacks into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

77.     There are three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51.

78.     Once all three preconditions are established, Section 2 directs reviewing courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

79.     These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority- vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been

elected to public office in the jurisdiction.

80.     The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

81.     Under S.B. 927, the Black community of interest in the East St. Louis area is cracked, with Black voters moved from House District 114 into House District 113, resulting in the dilution of the electoral strength of House District 114's Black voters, in violation of Section 2 of the Voting Rights Act.

82.     Black voters in East St. Louis and in adjoining communities in the Metro-East area of Illinois are sufficiently numerous and geographically compact to constitute a majority of eligible voters in a state House of Representatives District.

83.     Under Section 2 of the Voting Rights Act, the Illinois legislature was required to maintain House District 114 as a district in which Black voters have an equal opportunity to elect their candidates of choice.

84.     Black voters in East St. Louis and in adjoining communities in the Metro-East area of Illinois are politically cohesive, and elections in House District 114 reveal a clear pattern of racially polarized voting, which when combined with the removal of Black voters from House District 114 under S.B. 927 will allow the bloc of White voters usually to defeat the Black voters' preferred candidates.

85.     The totality of the circumstances establishes that the manner in which S.B. 927

has drawn House District 114 has the effect of denying Black voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

86.     By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

2.     Declare that House Districts 112, 113 and 114 under S.B. 927 constitute a racial gerrymander in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.

3.     Declare that House Districts 112, 113 and 114 under S.B. 927 unlawfully result in a denial or abridgement of the right of Black citizens of the United States in House District 114 to vote on account of their race or color in violation of Section 2 of the Voting Rights Act;

4.     Issue a permanent injunction enjoining Defendants from enforcing or giving any effect to the boundaries of House Districts 112, 113 and 114 in S.B. 927, including an injunction barring Defendants from conducting any elections for the Illinois House of Representatives based on House Districts 112, 113 and 114;

5.     Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for new Illinois House of Representatives districts;

6.     Make all further orders as are just, necessary and proper to ensure complete relief consistent with this Court's orders; and

7. Grant such other or further relief as the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees, expense and reasonable costs, as authorized by 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

Respectfully submitted, this 15th day of October 2021.

By: /s/ Aneel L. Chablani
Aneel L. Chablani (No. 6242658)
Ami Gandhi (No. 6282924)
Clifford Helm (No. 6319229)
CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
100 N. LaSalle St., Ste. 600
Chicago, IL 60602
Telephone:     (312) 630-9744
Facsimile:     (312) 630-1127
E-mail:  achablani@clccrul.org
E-mail:  agandhi@clccrul.org
E-mail:  chelm@clccrul.org

Jon M. Greenbaum *(application pending)*
Ezra D. Rosenberg *(application pending)*
James T. Tucker *(application to be filed)*
Ryan R.T. Snow *(application pending)*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, N.W. Suite 900
Washington, D.C. 20005
Telephone:     (202) 662-8600
Facsimile:     (202) 783-0857
E-mail:     jgreenbaum@lawyerscommittee.org
E-mail:     erosenberg@lawyerscommittee.org
E-mail:     jtucker@lawyersommittee.org
E-mail:     rsnow@lawyerscommittee.org

Joseph M. Drayton *(application to be filed)*
Russell Capone *(application to be filed)*
Elizabeth Wright *(application to be filed)*
Anne Bigler *(application to be filed)*
Joyce Rodriguez-Luna *(application to be filed)*
COOLEY LLP
444 W Lake Street, Suite 1700
Chicago, IL 60606

21

Telephone:    (312) 881-6500
Facsimile:    (312) 881-6598
E-mail:    jdrayton@cooley.com
E-mail:    rcapone@cooley.com
E-mail:    ewright@cooley.com

*Counsel for Plaintiffs East St. Louis Branch NAACP,
Illinois State Conference of the NAACP, and United
Congress of Community and Religious Organizations*