**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| EAST ST. LOUIS BRANCH NAACP, *et al.*, | |
| Plaintiffs, | **Civil Action No. 1:21-cv-05512** |
| v. | |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | **Circuit Judge Michael B. Brennan** **Chief District Judge Jon E. DeGuilio** **District Judge Robert M. Dow, Jr.** |
| | **Three-Judge Court** **Pursuant to 28 U.S.C. § 2284(a)** |
| Defendants. | |

**REPLY BRIEF IN SUPPORT OF RESPONSE
TO DEFENDANTS' REMEDIAL HOUSE LEGISLATIVE MAP AND
<u>IN SUPPORT OF PLAINTIFFS' REMEDIAL MAPS</u>**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 5

I.   NAACP/UCCRO'S CLAIMS ARE NARROWLY FOCUSED AND NOT BASED ON A "MECHANICAL" 50%+ RULE ................................................................... 5

II.  SB 927 IS AN UNCONSTITUTIONAL RACIAL GERRYMANDER .............................. 6

III. SB 927 VIOLATES SECTION 2 OF THE VOTING RIGHTS ACT ................................. 10

   A.   NAACP/UCCRO Proved the *Gingles* Preconditions ...................................... 10

      1.   First *Gingles* Precondition ..................................................................... 10

      2.   Second *Gingles* Precondition ................................................................. 13

      3.   Third *Gingles* Precondition ................................................................... 13

   B.   Plaintiffs Have Proved the Totality of the Circumstances ............................. 17

IV.  THIS COURT SHOULD ACCEPT PLAINTIFFS' REMEDIAL MAP ............................. 20

V.   THE REDISTRICTING PROCESS WAS NEITHER OPEN NOR FAIR .......................... 25

CONCLUSION ......................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. Johnson*,
521 U.S. – (20--) ........................................................... 16, 23

*Bartlett v. Strickland*,
556 U.S. 1 (2009) ........................................................ 11, 12, 22

*Bethune-Hill v. Va. State Bd. of Elections*,
137 S. Ct. 788 (2017) ...................................................... 22, 23

*Black Pol. Task Force v. Galvin*,
300 F. Supp. 2d 291 (D. Mass. 2004) ...................................... 20

*Bush v. Vera*,
517 U.S. 952 (1996) ...................................................... 2, 7, 19

*Campuzano v. Ill. State Bd. of Elections*,
200 F. Supp. 2d 905 (N.D. IL 2002) .................................... 4, 13, 14

*Cooper v. Harris*,
137 S. Ct. 1455 (2017) ............................................... 2, 6, 15, 21

*Ketchum v. Byrne*,
740 F.2d 1398 (7th Cir. 1984) ............................................. 21

*League of United Latin Am. Citizens v. Clement*,
999 F. 2d 831 (5th Cir. 1993) ............................................ 18

*League of United Latin American Citizens v. Perry*,
548 U.S. 399 (2006) ...................................................... 13

*Miller v. Johnson*,
515 U.S. 900 (1995) ....................................................... 2

*Negron v. City of Miami Beach, Florida*,
113 F.3d 1563 (11th Cir. 1997) ........................................... 11

*North Carolina v. Covington*,
138 S. Ct. 2548 (2018) .................................................... 7

*Thornburg v. Gingles*,
478 U.S. 30  (1986) .................................................. passim

*United States v. Euclid City Sch. Bd.*,
    632 F. Supp. 2d 740 (S.D.N.Y. 2007) ....................................................................... 12

*United States v. Vill. of Port Chester*,
    704 F. Supp. 2d 411 (S.D.N.Y. 2010) ....................................................................... 12

*Veasey v. Abbott*,
    830 F. 3d 216 (5th Cir. 2016) ...................................................................................... 7

**Other Authorities**

S. Rep. No. 417 (1982),
    *reprinted in* 1982 U.S. Code Cong. & Admin. News ......................................... 18, 19

## INTRODUCTION

Plaintiffs Illinois State Conference of the NAACP and United Congress of Community and Religious Organizations ("NAACP/UCCRO") demonstrated in their opening brief that in SB 927, Defendants diluted the voting strength of Black voters in HD 114 in order to protect the white Democratic incumbents in HD 112 and HD 113 by doing the following:

1. Moving approximately 16,000 voters, of whom about 4,200 are Black, from the moderately under-populated HD 113 to the already over-populated HD 112;

2. Moving approximately 22,000 voters, of whom over 5,250 are Black, from the severely under-populated HD 114 to HD 113, to racially balance HD 113 after the move of voters from HD 113 to HD 112; and

3. Moving over 29,000 voters to HD 114 – mostly from outlying rural areas – of whom only about 5,000 are Black, not only to remedy its existing underpopulation, but also to compensate for the voters moved from HD 114 to HD 113 that exacerbated HD 114's existing underpopulation.

As a result of these machinations, the overpopulated HD 112 **_gained_** more than 3,000 Black voters and **_lost_** more than 7,500 white voters, while the underpopulated HD 114 **_lost_** more than 200 Black voters and **_gained_** more than 7,600 white voters. ECF No. 44-1 at 34.[1] In effect, Defendants turned a district that has elected Black representatives to the State House continuously since the 1970s – and the only Illinois House District electing a Black State House Representative in Southern Illinois – into a toss-up district, in terms of the ability of Black voters to elect their preferred candidates. Defendants do not dispute any of these basic facts; indeed, they either

---

[1] Citations to docket entries in this brief are to the NAACP/UCCRO docket unless otherwise specified.

expressly concede them or fail to present any evidence or expert analysis to counter NAACP/UCCRO's evidence and expert analysis.

As to the racial gerrymander claim, Defendants admit that the essential idea behind SB 927's drawing of HD 114 was to enhance the Democratic incumbent's prospects in HD 112 – as if having a partisan goal provides them with a free pass to reach that goal using race as the tool. But the law is decidedly to the contrary. Race cannot be used as a means of achieving a political end in redistricting. *Cooper v. Harris*, 137 S. Ct. 1455, 1464 n.1 (2017); *id.* at 1473 n.7; *Bush v. Vera*, 517 U.S. 952, 969-70 (1996); *Miller v. Johnson*, 515 U.S. 900, 914 (1995).

Defendants also claim that race "was not considered" in the redistricting. Their assertions are often vague, almost always in the passive tense, and invariably accompanied by contradictory admissions that they were aware of the demographics at the time. Not unexpectedly, as defendants often do in cases of this sort, they cursorily dismiss NAACP/UCCRO's proofs of race as the prime motivating factor in the redistricting decisions pertaining to Metro East as "circumstantial evidence." Our courts, however, are well aware that so-called direct evidence of intentional racial discrimination is hard to come by these days, and that circumstantial evidence is not only often the only available evidence, but can also be the best evidence in cases like this one.

Here, Defendants have not refuted a scintilla of the abundant evidence showing the primacy of race in their decision-making, not the fact that demographic data on race and election data at the precinct level was gathered and sent to their consultant for his review, not that he reviewed that data, and not that he was asked to report to legislators what he was "seeing." Their silence on this issue is deafening.

If anything, Defendants' purported justification as to why they drew the lines they did are so feeble as to border on the incredible. They claim they had to draw the districts the way they did

because HD 114 was underpopulated. But, then the natural solution would have been to add voters to the underpopulated district, not exacerbate the underpopulation by moving Black voters out of HD 114 to HD 113 to make up for the Black voters moved from HD 113 to HD 112.

Defendants next claim that they drew HD 114 in order to preserve communities of interest. But if that were so, they cannot logically explain why they chose to pair East St. Louis and its overwhelmingly Black population with almost 8,000 new white voters from the far-reaches of white rural areas while overlooking adjacent and contiguous areas with materially more Black voters. They cannot explain why, and the Court therefore cannot escape the conclusion that SB 927 constitutes a racial gerrymander.

With respect to the Section 2 claim, Defendants do not contest that NAACP/UCCRO have met the first *Thornburg v. Gingles* precondition of demonstrating that a compact majority-minority district can be created in the area of HD 114. 478 U.S. 30, 50 (1986). This was satisfied through the submission of the Liability Map. Defendants allege only a legally questionable and easily remedied deficiency that NAACP/UCCRO's Liability Map did not include the surrounding districts. Although Section 2 jurisprudence does not require them to do so, NAACP/UCCRO have submitted a slightly modified Alternate Liability Map that cures that alleged deficiency and addresses Defendants' complaint that both the original Liability Map and the Remedial Map pitted two incumbents against each other. Defendants also assert that, because NAACP/UCCRO simultaneously submitted a remedial map (and now an Alternate Remedial Map) with their liability map, the former must also meet the first *Gingles* precondition. These two maps serve two different functions. The Alternate **Liability** Map is intended to satisfy the first *Gingles* precondition; the Alternate **Remedial** Map is intended to demonstrate how the Court may provide a complete remedy for both the Section 2 violation and the racial gerrymander violation. There is no support for

3

Defendants' position that both must meet the first *Gingles* precondition, which is irrelevant in any event to the remedy for the racial gerrymander violation.

Defendants do not contest that NAACP/UCCRO have met the second *Gingles* precondition. In fact, their expert acknowledges that Black voters vote cohesively.

Defendants claim that NAACP/UCCRO have not met the third *Gingles* precondition, mischaracterizing the requested remedy as one for a "safe" district for Black voter preferred candidates. To the contrary, NAACP/UCCRO seek only that which precedent mandates: a complete cure to the constitutional and statutory violations in the form of an "effective" district, not one that guarantees success, but that makes it "more likely than not" that Black voters in HD 114 will be able to elect a candidate of their choice. This is the standard applied by this Court in previous redistricting cases. *See Campuzano v. Ill. State Bd. of Elections*, 200 F. Supp. 2d 905, 908-09 (N.D. Ill. 2002).

In this context, Defendants claim that the NAACP/UCCRO expert's conclusion that the SB 927 HD 114 changes HD 114 from a relatively safe district for Black-preferred candidates to, at best, a "toss-up" is not sufficient under Section 2 to support the need for a more effective district to cure the violations. As will be shown below, however, Defendants' own expert, Dr. Lichtman, has previously testified that it undoubtedly does support that need, and that this dilution of the voting strength of Black voters in HD 114 constituted a violation of Section 2 of the Voting Rights Act.

For all of these reasons, and more, NAACP/UCCRO respectfully ask this Court to reject Defendants' enacted SB 927, which they present as their remedial plan for HD 112, 113, and 114, and accept the Alternate Remedial Map submitted by NAACP/UCCRO.

**ARGUMENT**

I. **NAACP/UCCRO'S CLAIMS ARE NARROWLY FOCUSED AND NOT BASED ON A "MECHANICAL" 50%+ RULE**

NAACP/UCCRO's claims focus on a single district in a unique area of Illinois that has a tragic history of racial strife and a demonstrated history of racially polarized voting. Both the Defendants' brief and Dr. Lichtman's Declaration, however, are addressed to all three sets of plaintiffs, and often without distinguishing among them. This is particularly so in the lengthy beginning of Dr. Lichtman's Declaration, where he attempts to broad brush NAACP/UCCRO's claims by baldly asserting that all plaintiffs seek to impose a mechanical, pre-selected majority-minority standard that ignores the existence of other minority groups in the jurisdiction, and packs minority voters into supposedly existing majority-minority districts. *See* ECF No. 54-1 at 7 ("By a significant portion of minority voters, they [referring to 'all three plaintiffs'] do not mean all minorities").

Perhaps realizing that he is overstating his case, Dr. Lichtman acknowledges that "[a]ll but one of their challenged districts is majority-minority, not majority white, in its citizen voting age population (CVAP)." ECF No. 54-1 at 7. He does not identify the one exception, but it is likely HD 114, the district challenged by the NAACP/UCCRO plaintiffs, which is indisputably majority white under the 2011 plan and under the SB 927 plan. Thus, Dr. Lichtman's lengthy exegesis on the evils of packing voters of color into preexisting majority-minority districts, ECF No. 54-1 at 7-33, has nothing whatsoever to do with NAACP/UCCRO's claims.

NAACP/UCCRO's offering the Court a ***liability*** map that demonstrates the feasibility of a majority-minority Black HD 114 is not the result of what Defendants and Dr. Lichtman persist in calling a "pre-selected" or "generic" or "mechanical" adherence to a 50%+ single-race automatic threshold. ECF No. 54-1 at 8, 14. Rather, it is a prerequisite to invoking the protections of Section

5

2 of the Voting Rights Act in accordance with *Gingles*. In fact, the **Remedial** Map that NAACP/UCCRO have submitted presents a district with under 50% Black VAP. Yet, Defendants – wrongly, as will be demonstrated below – **also** criticize the NAACP/UCCRO Remedial Map because it presents a district **below** 50% Black VAP. Defendants cannot have it both ways.

## II.   SB 927 IS AN UNCONSTITUTIONAL RACIAL GERRYMANDER

In their opening brief, NAACP/UCCRO demonstrated that Defendants' remedial plan for HD 114 constituted an unconstitutional racial gerrymander because it was the result of a plan to move Black voters into HD 112. Nowhere in their papers do Defendants expressly deny this overarching concept of NAACP/UCCRO's claims. To the contrary, Defendants concede the link when they expressly acknowledge that SB 927 "decreased Democratic, Black population in HD 114 . . . while increasing Democratic, Black population in nearby HD 112 – a district that has become increasingly vulnerable to Republican control." ECF No. 54 at 49 n.11.

Having entangled race and politics, Defendants are reduced to arguing that NAACP/UCCRO have not "disentangle[d]" the two. ECF No. 54 at 50-52, citing *Harris*, 137 S. Ct. at 1473. But, as the *Harris* Court explained, the inquiry into the disentanglement of race from partisanship "is satisfied when legislators have 'placed[d] a significant number of voters within or without' a district predominantly because of their race, regardless of their ultimate objective in taking that step. . . . [T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Harris*, 137 S. Ct. at 1473 n.7. This is precisely what occurred in Metro East.

According to established precedent, Defendants cannot escape strict scrutiny simply by disclaiming that there is any "direct evidence" that they relied on race, or by dismissing NAACP/UCCRO's evidence as "circumstantial." ECF No. 54 at 48. As numerous courts have

noted, rarely will it be the case that discriminators will expressly state that they are discriminating, and circumstantial evidence is often the best and only evidence of a racial motivation. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 235 (5th Cir. 2016) ("In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence.").

Thus, in *Bush v. Vera*, 517 U.S. 952, 969-70 (1996) (plurality opinion), despite state officials' protestations to the contrary and that the district drawers' intent did not show race "to be the sole factor considered," the Supreme Court affirmed a finding of a racial gerrymander when "the lines were continuously reconfigured to assist in protecting the Democratic incumbents in the Dallas/Fort Worth metroplex area by spreading the Black population to increase the Democratic party index in those areas." And, in *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018) (*per curiam*), cited in NAACP/UCCRO's opening brief, but not discussed by Defendants in their response, the Court relied on "sufficient circumstantial evidence that race was the predominant factor" governing the redistricting, despite defendants' "insistence that the . . . legislature did not look at racial data" in drawing the districts.

In both *Vera* and *Covington*, the Court relied on the same sort of evidence as NAACP/UCCRO have presented here. For example, the *Vera* Court found "most significantly, the objective evidence provided by the district plans and demographic maps" as suggesting "strongly the predominance of race." 517 U.S. at 970. This included that the districting software used by the State provided racial data at the block-by-block level. *Id.*

Here, as noted in NAACP/UCCRO's opening brief, objective evidence of the Defendants' knowledge and use of racial information in drawing the lines is overwhelming. First and foremost, of course, is the "evidence concerning the shape and demographics" of the districts. *Covington*,

138 S. Ct. at 2553. But there is much more: the June press release issued by the Democratic legislators with the June Redistricting Plan, indicating that racial diversity was one of their guiding principles; the inclusion of minority CVAP data in the tables produced for the June Plan and Voting Age data for the September Plan, the document comparing "Minority District Percentages" between 2011 and 2021 plans; and the House Resolution that accompanied the final September Plan, that detailed demographic information for the Metro East districts. *See* ECF No. 44 at 28; Ex. A, House Resolution 443. Nowhere in their papers do Defendants respond to this evidence.

Further, as was discussed in NAACP/UCCRO's opening brief, among the most powerful evidence is the information that was expressly requested by Defendants' consultant, Dr. Lichtman, so that he could examine "the voting strength of minorities." ECF No. 44-15. These included "[d]emographic data for each district in each plan, broken down according to . . . race" and "[m]atched with [election] returns, precinct-level racial demography . . . ." ECF No. 44-17 at 2. Legislative Defendants provided this information to Dr. Lichtman over a two-month period, during which time he was asked to report to the legislature "what [he was] seeing." ECF No. 44-21. Despite submitting a 231-page Declaration in response to NAACP/UCCRO and the other plaintiffs' submissions, Dr. Lichtman never explains whether he responded to this query, and if he did, what exactly he was "seeing" in the data. Based on Defendants' own documents and Dr. Lichtman's analysis of the racial demographics in Metro East, this Court can draw the fair inference that Defendants were aware race was a predominant factor in making their surgical-like decisions to move Black voters from HD 113 to 112 and from HD 114 to 113.

Indeed, the sparse attempt by Defendants at a factual defense to this abundant evidence of race as a motivating factor in the redistricting serves only to prove NAACP/UCCRO's point. First, they argue that the changes in HD 113 and 114 were necessary because they were

"underpopulated," which "required the legislature to make adjustments." ECF No. 54 at 50. But, if a district is underpopulated, then the solution would be to **add** voters to it. Defendants did the opposite. HD 113 was barely underpopulated entering the redistricting process. It only became significantly underpopulated by the intentional acts of Defendants when they decided to move Black voters from HD 113 to HD 112. And HD 114, which was significantly underpopulated entering the redistricting process, became even more underpopulated because Defendants had to move Black voters from HD 114 to HD 113 to compensate for the voters moved from HD 113 to HD 112. Simply put, Defendants created and exacerbated the underpopulation of HD 113 and HD 114 because they had embarked on a racial gerrymander.[2]

Similarly, there is little logic to Defendants' *post hoc* explanation, pressed by Representative LaToya Greenwood, that the changes were made in order to preserve "anchor cities" in each District.[3] East St. Louis could never account for more than approximately 17% of

---

[2] In this context, Jonathan Maxson's declaration is telling for what it does not say and how it conveys the little it does. Mr. Maxson states he was "involved" in drawing the boundaries of the Metro East districts, ECF No. 54-2 at ¶ 13, but nowhere states who else was "involved" or what his level of responsibility was vis-a-vis the finished product, other than to assist in the meeting of the one person/one vote requirement – a situation that was made worse by a decision in which he apparently was not "involved." Indeed, most of his narrative as to the process is in the passive voice: "changes were made"; "the changes to the boundaries of RD 113 and RD 114 relevant to Washington Park were made"; "[r]acial composition was not considered when making those changes." As Dr. Collingwood notes, however, Washington Park is nearly 90% Black, and "any demographer would know that by focusing on Democratic performance in this area of Washington Park is similar to focusing on race." Collingwood Rebuttal Report at 10. Only after the maps were finalized does Mr. Maxson own up to having done something specific to the districts: "I examined the Black VAP and CVAP of the districts, it was clear that the changes benefit Black voters in the area in that they have opportunities to influence the election of two House districts rather than one," ECF No. 54-2 at ¶ 14, essentially an admission that the Black vote had been cracked.

[3] NAACP/UCCRO have great respect for Representative Greenwood and appreciate that she may have a different opinion as to how HD 114 should have been drawn. NAACP/UCCRO also have great respect for all legislators of color who voted in favor of SB 927. However, the Fourteenth Amendment and the Voting Rights Act were not created to protect political incumbents – they

the population of any district, because of its dwindling population of approximately 17,000. If, as Defendants claim, their goal was "keeping together cities or townships that share community concerns and identities," ECF No. 54 at 50, the natural choice would be to maintain the core urban areas in the same district as East St. Louis. But that is not what Defendants did. Instead, they paired East St. Louis with largely white periphery areas, and they were forced to do so because of their decision to funnel Black voters from HD 114 through HD 113 to HD 112. That is an unconstitutional racial gerrymander.

## III.   SB 927 VIOLATES SECTION 2 OF THE VOTING RIGHTS ACT

In their opening brief, NAACP/UCCRO demonstrated that Defendants violated Section 2 of the Voting Rights Act. Nothing in Defendants' papers undercuts that conclusion.

### A. NAACP/UCCRO Proved the *Gingles* Preconditions

#### 1. First *Gingles* Precondition

With their opening brief, NAACP/UCCRO submitted a liability map to demonstrate that it is possible to draw a compact majority-minority district in the Metro East region, satisfying the first *Gingles* precondition. Defendants do not dispute that NAACP/UCCRO's Liability Map demonstrates that the Black population does comprise a sufficiently large group to constitute a majority in the challenged district. Defendants object only that the map is "incomplete" because it "does not account for any population changes to neighboring districts." ECF No. 54 at 35. However, NAACP/UCCRO are unaware of any case that stands for the proposition that a liability

---

were created to protect minority voters. With particular respect for Representative Greenwood, NAACP/UCCRO note that, while she states in her Declaration that "race was not a factor in determining the Democratic performance" of HDs 112, 113, and 114, ECF No. 54-7 at ¶ 18, she does not expressly state that race was not a factor in the drawing of the lines of the districts. Representative Greenwood openly acknowledges that she is "very familiar" with the "demographics" of the Metro East, and that she supported SB 927 "[b]ased on my understanding of . . . the demographics of the Metro East area. . . ." ECF No. 54-7 at ¶¶ 12, 21.

plan offered to meet the first *Gingles* precondition must include a map of the surrounding districts.[4] In any event, even though it does not appear to be required, NAACP/UCCRO, with this reply brief, submit the original Liability Map and an Alternate Liability Map, showing the effect on the surrounding districts in both maps.[5]

Defendants also object that the Liability Map is "not contiguous," but nowhere explain how that is so. There is no non-contiguous point on the Liability Map submitted by Plaintiffs. *See* Weichelt Rebuttal Report at 6–7.[6]

Next, Defendants challenge the Remedial Map submitted by Plaintiffs' expert, Dr. Ryan Weichelt, because its Black VAP is slightly under 50%,[7] arguing that it is contrary to the requirements of *Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) (plurality opinion), which Defendants read as requiring a majority-minority district for remedial maps as well as for liability maps to meet *Gingles* first precondition. *Bartlett* simply does not stand for that proposition.

---

[4] The only case offered by Defendants in support of their position is *Negron v. City of Miami Beach, Florida*, but it is not on point. There, the plaintiff had challenged the at-large elections of the entire Miami Beach seven-member City Commission but had submitted a plan for only one single-member district, not for the other six. In that context, the court stated that "[a] district court cannot implement an incomplete plan, containing only a single district, with the rest of the map left blank." 113 F.3d 1563, 1571 (11th Cir. 1997).

[5] In her declaration, Representative Greenwood raised the concern of her being placed in the same district with the incumbent from HD 113, Representative Jay Hoffman. ECF No. 54-7 at ¶ 22. NAACP/UCCRO's Alternate Liability Map addresses this concern by moving Representative Hoffman to HD 113. NAACP/UCCRO also submits an Alternate Remedial Map that addresses this concern in a similar manner.

[6] Defendants challenge aspects of the proposed remedial plan on other bases not relevant to the majority-minority and compactness requirements of the first *Gingles* threshold, such as the pairing of incumbents and the inclusion of certain urban areas in the proposed plan. ECF No. 54 at 36. Plaintiffs will address those arguments in the remedy section of this brief.

[7] The original Remedial Map submitted by Dr. Weichelt had Black VAP of 49.45% for the proposed HD 114. The Black VAP in the Alternate Remedial Map is 48.12%.

As the Court stated in *Bartlett*, the issue presented was whether the Voting Rights Act "can be invoked" in a district that is not a majority-minority district. 556 U.S. at 6. In answering the question in the negative, the Court reaffirmed *Gingles* as setting preconditions for determining which cases can be subject to Section 2 analysis. The Court emphasized that its holding "recognizes only that there is no support for the claim that § 2 can require the creation of crossover districts in the first instance." *Id*. at 24. Nowhere in the opinion did the plurality indicate that the ultimate remedy for a Section 2 violation must always include a majority-minority map. Indeed, the Court indicated that "[s]tates can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts." *Id*.

Indeed, in the typical Section 2 case, the plaintiff has no obligation to submit a remedial plan to the Court before liability is found; that often awaits the remedial phase of the case. In fact, courts have frequently ordered remedies in vote dilution cases that have little to do with the liability map offered by plaintiffs to meet *Gingles*' first precondition and which, specifically, do not require the creation of majority-minority districts. *See*, *e.g.*, *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 453 (S.D.N.Y. 2010) (adopting cumulative voting plan to cure vote dilution created by at-large system); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 770-71 (S.D.N.Y. 2007) (adopting limited voting plan to cure vote dilution created by at-large system).

The only reason NAACP/UCCRO's remedial plan is before the Court now is because this case is in a remedial phase, i.e., to ascertain whether Defendants' proposed remedial plan embodied in SB 927 meets constitutional and statutory standards.

Plaintiffs have submitted a liability plan that clearly meets *Gingles*' first precondition.[8]

---

[8] If, however, this Court finds that a remedial plan, as well as a liability plan, must meet the first *Gingles* threshold, even if the liability plan has, NAACP/UCCRO ask this Court to treat the Alternate Liability Plan as their remedial plan also.

2. Second *Gingles* Precondition

Defendants do not dispute Dr. Loren Collingwood's conclusion that Black voters in the Metro East area vote cohesively for candidates of their choice.[9]

3. Third *Gingles* Precondition

In *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 427 (2006) ("*LULAC v. Perry*"), the Court assessed the third *Gingles* precondition based on whether "the projected results" in the new plan "will often, if not always, prevent [minority voters] from electing the candidate of their choice." *LULAC v. Perry*'s standard as to whether a district was effective for minority voters echoed that of this Court just a few years earlier which held: "[i]n effective districts[,] African–American voters are not guaranteed success at the polls, but such districts do contain sufficient African–American voters so that, more likely than not, African–American preferences will determine the outcome of district elections." *Campuzano*, 200 F. Supp. 2d at 908-09. Applying that standard to the facts of this case, NAACP/UCCRO's proofs easily meet the third *Gingles* precondition.

NAACP/UCCRO's expert, Dr. Collingwood, undertook election performance evaluations of HD 114, as it was drawn under SB 927. Dr. Lichtman did not do so, despite describing Dr. Collingwood's work as applying "an appropriate standard for assessing Black voter opportunities in House District 114." ECF No. 54-1 at 164.[10] In fact, Dr. Collingwood applied the same method

---

[9] Defendants and Dr. Lichtman incorrectly refer to Dr. Collingwood throughout their submissions using feminine pronouns; for the record, Dr. Collingwood uses masculine pronouns.

[10] Indeed, Dr. Lichtman consistently praises Dr. Collingwood's approach and methods, finding one error that Dr. Collingwood made in the number of Black candidates that were elected in the Metro East area, ECF No. 54-1 at 85-88, an error which had no bearing on Dr. Collingwood's conclusions, and which he has accounted for in his Rebuttal Declaration.

in his election performance evaluation – reconstituting elections as to precincts within the precise borders of SB 927 and NAACP/UCCRO's proposed HD 114, which Dr. Lichtman has applied in past cases.[11]

Based on his review of Dr. Collingwood's analysis, Dr. Lichtman concedes that voting is racially polarized in the Metro East area, indicating that "[p]olarization between Blacks and whites on the surface appears substantial." ECF No. 54-1 at 132. Where Dr. Lichtman and Dr. Collingwood part company is whether Dr. Collingwood's results show that HD 114, as drawn in SB 927, will be an effective district. Pointing to the probable future results based on his specific analysis of the SB 927 proposed HD 114, Dr. Collingwood says it is more likely not to be an effective district for Black voters, because SB 927, if enacted, will change a safe Black district into a toss-up. ECF No. 44-2 at 18.

The key to Dr. Collingwood's conclusions is the ever-tightening projected election results to the point that, were the 2020 Board of Review election held under the SB 927 plan's HD 114, the Black candidate might eke out a victory over the white candidate by 0.8 percentage points, 50.4% to 49.6%. ECF No. 44-2 at 17. This is significant because Dr. Lichtman himself testified in *Campuzano*, the prior Illinois case he highlights in his report, that such a margin of victory constitutes a "toss-up" – the same term Dr. Collingwood ascribes to the situation – and does not represent a performing district for Black voters. Specifically, Dr. Lichtman testified that an opportunity district for Black voters is "somewhere in between, you know, a tossup and what some might regard as a safe seat . . . [Y]ou would be more comfortable if it was not just 51, but something over that." Ex. B, A. Lichtman deposition testimony, *Yolanda Campuzano v. Illinois State Board*

---

[11] Dr. Lichtman confirms his having "used this methodology successfully before, including in Illinois," and proceeds to detail the results of his analysis in the previous case, which have nothing to do with this case. *See* ECF No. 54-1 at 164-66.

*of Elections*, No. 01-C-503776, at 83 (N.D. Ill. Jan. 5, 2002). Thus, according to Dr. Lichtman and contrary to Defendants' position, ECF No. 54 at 37, a "toss-up" district is not an "effective cross-over district."

Dr. Lichtman compounds his unjustified criticism of Dr. Collingwood's analysis by accusing him of "speculat[ing]" that Black population of HD 114 may dwindle over time," relying on CVAP data showing a slight increase in Black relative to white population in St. Clair County. ECF No. 54-1 at 198. Dr. Lichtman is inaccurate on several counts. First, his reliance on CVAP data means that he is relying on the American Community Survey data from 2015-2019, which significantly overcounted the Black population in the Metro East area. Specifically, "[t]he ACS estimates severely overestimated District 114's total populations and Black populations." ECF No. 44-1 at 23.

Second, Dr. Lichtman is describing St. Clair County as a whole, not HD 114 specifically. The actual 2020 Census Data in fact does show a substantial decrease in HD 114's Black population between 2010 and 2020. Any increase in Black population in St. Clair County is due largely to the increase in Black population in HDs 112 and 113, and not at all to that in HD 114.

As Dr. Collingwood explains in his Rebuttal Report, "Black demographic decline in SB927 HD-114 will likely make the district further away from a Black performing district over the next few cycles," and as it is likely to continue the trend of "what appears to be a toss-up district might begin to lean away from Black-preferred candidates as soon as the next election." Collingwood Rebuttal Report at 9.

In this context, Defendants' reliance on *Harris* for the proposition that Plaintiffs are wrongly seeking to make an effective crossover district safer is decidedly misplaced. ECF No. 54 at 37-38. In *Harris*, the Court was not assessing the prospects of future elections for the purpose

15

of determining whether newly drawn districts would comply with Section 2; rather, the Court was adjudicating the viability of the jurisdiction's defense that it was necessary to racially gerrymander two districts in order to comply with Section 2. In that context, the Court looked ***back*** at the district's performance over the last 20 years and found there was "no evidence" of effective white bloc-voting to justify a racial gerrymander based on the necessity to comply with Section 2. *Id*. at 1470. Further, the *Harris* Court distinguished North Carolina's improper attempt to rely on Section 2 to justify a racial gerrymander from the requirement that "a legislature undertaking a redistricting must assess whether the new district it contemplates (not the old ones it sheds) conform to the VRA's requirements." *Id.* at 1471.[12]

Dr. Collingwood's opinions are based on an analysis touted by Dr. Lichtman as the right approach and consistent with the case law. Dr. Lichtman's opinions are offered without analysis of the sort he has stated is essential and contradict his prior testimony. The weight of the evidence firmly supports the conclusion that NAACP/UCCRO have met the third *Gingles* precondition: voting in HD 114, as drawn in SB 927, will be racially polarized to the extent that Black voters will not be more likely than not to elect candidates of their preference. Simply put, HD 114, as drawn in SB 927, will not be an effective district for Black voters.

---

[12] Similarly, *Abrams v. Johnson*, 521 U.S. 74 (1997), is not relevant. *See* ECF No. 54 at 38-39. There, the Court was reviewing a trial court's factual determination that the third *Gingles* factor had not been met. (The trial court had rejected Dr. Lichtman's testimony that it had been met.) It is unclear from the decision whether any of the elections that were analyzed were based on old lines or new lines – with the key exception of the 1996 election, which had been held under the new lines.

### B. Plaintiffs Have Proved the Totality of the Circumstances

In their opening brief, Plaintiffs demonstrated that the totality of the circumstances, as viewed through Senate Factors 1, 2, 5, 7, and 8, support the conclusion that the drawing of HD 114 violated Section 2 of the VRA. Defendants' response is cursory at best.

**Factor 1: Discrimination in Voting –** It is heartening that Illinois today allows greater "democratic access" than most other states, "especially when compared to Republican controlled states," ECF No. 54 at 42, but Defendants have no answer to the permanent scars left by the decades of violent action perpetrated by the white majority to stop Black people from voting that stretched over a century from the Reconstruction Era into the last quarter of the Twentieth Century.

**Factor 2: Racially Polarized Voting** – Defendants' differences with Dr. Collingwood's analysis have been rebutted above.

**Factor 5**: **Socio-Economic Discrimination Effects** – Defendants do not contest socio-economic disparities between white and Black people in St. Clair County, and they do not contest that there is a significant disparity between white and Black participation in elections. They claim only that Plaintiffs did not show that the former caused the latter or that there is no evidence of a connection with Illinois' actions. However, that is not the standard. The Senate Report accompanying the 1982 amendments to the VRA, which is the derivation of the term "Senate Factors," provided only that one must show a disparity, not that one caused the other:

> The courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

S. Rep. No. 417 at 29 n.114 (1982) (emphasis added), *reprinted in* 1982 U.S. Code Cong. & Admin. News at 207 n.114. *See League of United Latin Am. Citizens v. Clement*, 999 F. 2d 831, 866-67 (5th Cir. 1993) (en banc) (construing Senate Report as not requiring causal nexus between socioeconomic status and depressed political participation). Here, Plaintiffs have submitted the required evidence: Dr. Collingwood identified turnout gaps between white voters and Black voters from a low of 10 percentage points to a high of 24 percentage points. ECF No. 44-2 at 10. Defendants do not dispute Dr. Collingwood's analysis.

**Factor 7: Elected Black Representatives –** While Dr. Lichtman extols the success of Illinois as a whole in electing persons of color to office, ECF No. 54-1 at 144-150, he overlooks that NAACP/UCCRO's case is not about the State of Illinois but one area alone – Metro East. And Metro East's voters' track record in electing persons of color to the Illinois House is nonexistent other than from HD 114. ECF No. 44-3 at ¶ 46.

**Factor 9: Tenuousness of the Decision -** Defendants' only response to this Senate Factor is an odd one: the conclusory statement that "[t]he rationale for this bill is not tenuous" and the feeble explanation that the rationale for SB 927 was "to conform with the constitutional requirements for the apportionment of state legislative districts" of one person/one vote. ECF No. 54-1 at 154. NAACP/UCCRO's claims have never been about one person/one vote compliance, but rather where the lines were drawn. It is the Defendants' statements that they drew HD 113 and 114 the way they did because they were "underpopulated," when they intentionally created the underpopulation in HD 113 and exacerbated it exponentially in HD 114 in order to feed Black voters into HD 112, that makes the rationale for the districting tenuous. Also, Defendants' statements that they did not take race into account in drawing the lines of the Metro East districts are tenuous because their records show they had an abundance of demographic information at their

18

fingertips and their consultant Dr. Lichtman specifically asked for more. Their silence as to what Dr. Lichtman was "seeing" in his review of that information further makes the stated rationale for the decision tenuous. In sum, the illogical explanations for Defendants' decisions and their "See no evil/Hear no evil/Speak no evil" stance in light of abundant circumstantial evidence to the contrary render the official rationale for the way the Metro East House District lines were drawn tenuous.[13]

Moreover, Dr. Lichtman's rationale for the drawing of these districts is not the rationale given by others, underscoring the tenuousness of the official rationale. Others, including Representative Greenwood and Defendants themselves in their brief, assert that the September Plan had the design of "increasing Democratic, Black population in nearby HD 112—a district that has become increasingly vulnerable to Republican control." ECF No. 54 at 49 n.11. Protecting incumbency by moving racial groups is not a defense; it is part of the totality of the circumstances that proves the Section 2 vote dilution violation. As a sister court explained under extraordinarily analogous circumstances:

> We have left for last a final factor, to which we attach great importance. After having heard the testimony and reviewed the evidence, we find that incumbency protection played a significant role in the Committee's redistricting decisions. Incumbency protection is as old as electoral politics and, in its traditional form, is often thought to be a legitimate consideration in redistricting. *See, e.g., Easley v. Cromartie,* 532 U.S. 234, 247–48, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001); *Vera,* 517 U.S. at 965, 116 S.Ct. 1941. The issue becomes more complex, however, when race is used as a tool to achieve incumbency protection. *See Vera,* 517 U.S. at 968, 116 S.Ct. 1941 ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation."); *Clark v. Putnam County,* 293 F.3d 1261, 1271–72 (11th Cir.2002) ("Incumbency protection achieved by using race as a proxy is evidence of racial gerrymandering."); *Ketchum v. Byrne,* 740 F.2d 1398, 1408 (7th Cir.1984) ("We think there is little point for present purposes in distinguishing discrimination based on an ultimate objective of keeping certain incumbent whites in office from

---

[13] Defendants have provided evidence of responsiveness on the part of statewide elected officials, as per the eighth Senate Factor, but that factor is optional. S. Rep. No. 417 at 29 (1982).

discrimination borne of pure racial animus."). Here, the Committee made African–American incumbents less vulnerable by adding black voters to their districts and made white incumbents less vulnerable by keeping their districts as "white" as possible. Its actions evinced a willingness to move district lines simply to safeguard incumbents' seats, without regard to other objectives. This course of conduct sacrificed racial fairness to the voters on the altar of incumbency protection. *See generally Garza v. County of Los Angeles,* 918 F.2d 763, 778–79 (9th Cir.1990) (Kozinski, J., concurring and dissenting in part) (noting that "[p]protecting incumbency and safeguarding the voting rights of minorities are purposes often at war with each other"). That sacrifice lends considerable luster to the plaintiffs' case.

*Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 313-14 (D. Mass. 2004).

SB 927 requires the same "sacrifice" by Black voters in HD 114 as was made by those in *Galvin*. NAACP/UCCRO have proved that, under the totality of the circumstances, SB 927 violates Section 2 of the Voting Rights Act.

## IV. THIS COURT SHOULD ACCEPT PLAINTIFFS' REMEDIAL MAP

Throughout their papers, Defendants argue that NAACP/UCCRO are trying to make HD 114 a safe district for Black voter preferred candidates. Nowhere in NAACP/UCCRO's papers is such a claim asserted. Rather, NAACP/UCCRO seek a remedy that goes no further than rectifying the unconstitutional racial gerrymander and the unlawful vote dilution that has changed HD 114 into an ineffective district for Black voters to elect candidates of their preference. This Circuit's law is clear on the issue:

> In undertaking our review of the remedy ordered by the district court, we take note of the comments in the Senate Report concerning the 1982 amendments to the Voting Rights Act which adopt
>
> > [t]he basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated. . . . The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.
>
> Senate Report at 31 (footnote omitted). The Supreme Court has stated, in reviewing a district court decree in a voting rights discrimination context, that "the court has

20

> not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States,* 380 U.S. 145 (1965).

*Ketchum v. Byrne*, 740 F.2d 1398, 1412 (7th Cir. 1984) (citing Senate Report at 31).

As he does throughout his declaration, Dr. Lichtman praises the analysis performed by Dr. Collingwood, in particular Dr. Collingwood's use of a reconstituted election analysis to assess the performance of SB 927's HD 114. ECF No. 54-1 at 197-198. Dr. Lichtman appears to agree with Dr. Collingwood that HD 114, as drawn in SB 927, may no longer be a "safe" Black district. *Id.* at 198. Without explanation, however, Dr. Lichtman concludes that the redrawn district nevertheless "provides Black voters and [sic] equal opportunity with white voters to elect candidates of their choice." *Id.*

As noted above, Dr. Lichtman has previously testified that turning a district into a "toss-up" district was insufficient to consider that district as performing for voters of color. Here, however, when Dr. Collingwood draws that same conclusion as to HD 114 using the same methodology used by Dr. Lichtman, Dr. Lichtman argues that HD 114 was still a performing district for Black voters, even though it had been turned into a "toss-up" district.

Defendants also note that NAACP/UCCRO's remedial plan "further improves expected Democratic performance in HD 112 to the benefit of the white incumbent by moving Black voters into the district – the very conduct that the NAACP Plaintiffs alleged comprised racial gerrymandering in the September Plan." ECF. 50 at 86. Not quite. The conduct that Plaintiffs alleged comprised racial gerrymandering in the September Plan was the manipulation of populations based on race in order to achieve partisan ends and the dilution of Black votes in HD 114 – practices that are specifically prohibited under the Constitution and the VRA. *See Harris*, 137 S. Ct. at 1464 n. 1, 1473 n.7. That NAACP/UCCRO plaintiffs propose to remedy these constitutional and statutory violations by redrawing the districts, which is a necessary and

21

legitimate consequence of Defendants' illegal actions. *See Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 801 (2017) (compliance with Voting Rights Act is compelling state interest).

Next, Defendants distort NAACP/UCCRO's claims by questioning how NAACP/UCCRO can propose a remedial map with Black VAP under 50%, when their Section 2 claim is supposedly based on the allegation that "the Black VAP of the district is less than 50%." ECF No. 54 at 86. Nowhere in NAACP/UCCRO's papers is there such a claim. Plaintiffs' Section 2 claim is based wholly on the fact that Defendants **lowered** the proportion of Black votes – without reference to a 50% standard – in a performing district for Black voters' preferred candidates and turned it into a probable non-performing district. Although *Gingles* and *Bartlett*, as noted above, require that Section 2 plaintiffs show the possibility of the creation of a majority-minority compact district in order to invoke Section 2 of the VRA, the violation here can be cured with the creation of something slightly less than a majority-minority district. And that is what the Remedial Map proposes.

As also noted above, if this Court construes *Bartlett* as limiting the remedy in Section 2 cases to the creation of a majority-minority district, then NAACP/UCCRO's Alternate Liability Map complies fully with *Gingles* even under Defendants' theory, as explained above, and can be used to remedy the Section 2 violation in SB 927's drawing of HD 211.[14] However, if this Court rules that SB 927's drawing of the Metro East districts constitutes a racial gerrymander, then

---

[14] In this regard, Dr. Weichelt's comment that the remedial plan "does not meet the Section 2 requirements," ECF No. 44-1 at 5, was a loose reference to the fact that the Remedial Map was not intended to meet the standard of majority-minority of the first *Gingles* threshold, while the submitted Liability Map was required to, and did, meet the majority-minority standard. This comment has since been clarified in Dr. Weichelt's Rebuttal Declaration. *See* Weichelt Rebuttal Report at 13.

whether the Alternate Remedial Map need comply with the first *Gingles* precondition is no longer an issue. The law simply does not provide that a racial gerrymander can be remedied only by the creation of a majority-minority district. *See*, *e.g.*, *Abrams v. Johnson*, 521 U.S. 74, 86-88 (1997) (discussing remand of case pursuant to prior decision finding racial gerrymander, with remedy being creation of only two out of three majority-minority districts). To the contrary, the remedy for the racial gerrymander must be tailored to meet the constitutional violation, which here is the dilution of Black votes in HD 114. NAACP/UCCRO's Alternate Remedial Map remedies that violation without needing to create a majority-minority district.

Whether the Alternate Remedial Map with 48.12% Black VAP or the Alternate Liability Map with 51.75% Black VAP is adopted by this Court, neither map – as modified by Dr. Weichelt – presents any of the other problems raised by Plaintiffs. First, and foremost, the Alternate Liability Map and the Alternate Remedial Map do not ***improperly*** "use[] race as the predominant factor to create a new district. . . ." ECF No. 54 at 86. It is legitimate to use race in rectifying a Section 2 or racial gerrymander violation, and, in fact, it may be impossible not to. *Bethune-Hill*, *supra.*

Both the Alternate Liability Map and the Alternate Remedial Map operate as effective districts for Black voters to elect their preferred candidates, as per Dr. Collingwood's performance analysis in his Rebuttal Report. They accomplish this without violating any traditional districting principles. Contrary to Defendants' puzzling, unsupported assertion, neither the Liability Map nor the Remedial Map is "non-contiguous." ECF No. 54 at 35. There is no point on either redrawn HD 114 map that can be reached only by crossing lines to another district.

The proposed maps keep communities of interests whole, indeed more than SB 927's HD 114 does. In fact, SB-927 splits more cities and towns than does either the Alternate Liability Map or the Alternate Remedial Map. *See* Weichelt Rebuttal Report at 13.

The major difference between SB 927 and NAACP/UCCRO's maps is that NAACP/UCCRO's maps include greater portions of urban core areas, where it is more likely that the voters will share concerns with voters in East St. Louis; by contrast, SB 927 imported almost 8,000 white voters – largely from distant peripheral rural areas – who are unlikely to share the concerns of voters in East St. Louis. East St. Louis is deeply connected to communities such as Cahokia Heights, Fairview Heights, Shiloh, and O'Fallon, while having less in common with communities in the majority-white, rural areas of St. Clair County. *See* Mateen Decl. ¶¶ 4, 7, 8 (declaration from Black community member who is a long-time resident of Metro East, residing in Fairview Heights, Illinois, and residing within Alternate Remedial Map HD 114). In this context, Representative Greenwood's concern that East St. Louis would "harm its ability to advance its unique interests" if paired with other cities, ECF No. 54-7 at ¶ 22, should not prevent this Court from remedying a constitutional or statutory violation, considering that the municipality of East St. Louis would comprise no more than 17% of any district it was placed in and has a continuously dwindling population. Reducing the strength of the Black voters' power in HD 114 threatens to remove the strong community voice of East St. Louis in policy discussions in Springfield, in the face of threats such as gentrification and displacement. *See* Jones Decl. ¶¶ 6-14 (declaration from Black community member who is a pastor at church in East St. Louis, resides in Belleville, and was moved out of HD 114 through Defendants' SB 927 plan). Nowhere does Representative Greenwood explain how East St. Louis's interests are better served by being paired with white rural communities and a net influx of almost 8,000 more white voters than if paired

with part of the more racially diverse, core communities closer to East St. Louis. And that Washington Park "has been split between HDs 113 and 114 for at least two decades," ECF No. 54 at 88, is scarcely an argument against joining this important part of the Black community in Metro East with its community of interest in East St. Louis in order to rectify the racial gerrymander and Section 2 violations.[15]

## V.   THE REDISTRICTING PROCESS WAS NEITHER OPEN NOR FAIR

Defendants inaccurately describe the history of the public process for how the representative district maps were created, painting a false picture of broad community engagement and input. *See* ECF No. 54 at 4-13. The vast difference in the description of this process between plaintiffs, community groups, and Defendants was noted by the court in its October 19 order. *See* Mem. & Order, *Contreras*, No. 21-cv-3139, ECF No. 39 ("Ultimately, Plaintiffs say, the General Assembly approved a new map a single day after publicly releasing any version of its amended map and within hours of releasing the version that it enacted into law. *See id.* Defendants may well disagree with those characterizations, and we need not [and do not] do more than to note them at this time").

Defendant's narrative problematically dwells on the community hearings prior to the release of the 2020 decennial Census data, focusing on meetings which themselves did not concern

---

[15]   Representative Greenwood's other concerns have been addressed in NAACP/UCCRO's Alternate Liability and Remedial maps. None of Swansea is in the proposed HD 114, and Representative Hoffman is no longer in the proposed HD 114. Defendants' other support for their argument that traditional districting principles were not followed by Dr. Weichelt is virtually non-existent. In those paragraphs, Representative Greenwood says that she recommended what became SB 927 because she did not want to jeopardize the political power of East St. Louis. Defendants cite to Mr. Maxson's and Joseph Sodowski's Declarations, both of which use identical language to say that "many of the Plaintiffs' proposed changes . . . ignore traditional redistricting principles," without identifying **which** plaintiffs they refer to, let alone which changes, specifically, are allegedly problematic. ECF No. 54-2 at 7; ECF No. 54-6 at 5-6.

substance, but rather the need for meaningful engagement and transparency. Defendants' musings that the redistricting process "inevitably disappoints some constituencies, however, is not tantamount to being shut out of the process," ECF No. 54 at 11, minimizes the extreme frustration that witnesses consistently presented throughout the entire process, particularly in the final days leading up to the passage of SB 927.

In reviewing the timeline leading up to SB 927, Defendants falsely claim that Plaintiff UCCRO submitted recommendations, but did not include recommendations regarding Metro East. In fact, Plaintiff UCCRO did submit maps that included Metro East, at least one of which remains available on the General Assembly's website as of the date of this filing. *See* https://ilga.gov/house/committees/Redistricting/102Redistricting/HRED/Miscellaneous/UCCRO %20Metro%20East.pdf. Those maps were submitted during the first stage of the redistricting process, prior to the release of the decennial Census data.

However, UCCRO, just like all other community organizations and people across the state, simply did not have time to create any new proposals based on the 2020 Census data before the General Assembly passed new maps. In fact, numerous witnesses testified that the process that led to S.B. 927 was rushed and flawed. Roberto Valdez spoke as a representative of the Latino Policy Forum, which is a member of UCCRO's Unity Map coalition. He specifically identified that Latino Policy Forum planned on submitting a map to the committee, but they would need time to do so: "We do plan on providing a map similar to the one that we provided using ACS numbers, but as you can imagine, with only three weeks since the census numbers were produced, it does take some time to analyze and really not only produce the map but get input from community members." Ex. C, Aug. 26, 2021 Hr'g Tr. at 66-67.

26

Similarly, Reverend Robin Hood of UCCRO requested thirty days to review the proposals. *See id*. at 117 ("I think it will be wise and beneficial for the whole state to think about the 30 days' wait to respond. I was thinking about some of the reading that I did over the last couple of weeks and the disgust that people are feeling about this process being left out. So I think it would be wise for us to work together on these maps so that we can make it fair for everybody in these communities of color"). Jay Young of Common Cause Illinois also testified: "[W]e are, once again, witnessing a process that's unlikely to see much in the sense of true community engagement." *Id*. at 128.

After this hearing on August 26th, maps were first released for public review on August 30th through the House Democrats redistricting website, were changed on August 31st, were inserted as a House Floor Amendment into a shell bill (SB 927) on August 31st, and then were passed on August 31st. At the only redistricting hearing after the maps were released to the public, witnesses identified that they had essentially no time to review the proposed maps. The maps were passed later that day.

This flawed process led to what confronts this Court today.

## CONCLUSION

For the reasons stated above and in our opening brief, NAACP/UCCRO respectfully request that this Court reject Defendants' SB 927, which Defendants have presented as their remedial plan for HDs 112, 113, and 114, and adopt NAACP/UCCRO's Alternate Remedial Plan or its Alternate Liability Plan.

Dated: December 1, 2021          Respectfully submitted,

By:     */s/ Matthew L. Kutcher*
        Matthew L. Kutcher (No. 6275320)

27

COOLEY LLP
444 W Lake Street, Suite 1700
Chicago, IL 60606

Telephone: (312) 881-6500
Facsimile: (312) 881-6598
E-mail:mkutcher@cooley.com

Joseph M. Drayton (admitted *pro hac vice*)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
E-mail: jdrayton@cooley.com

Elizabeth Wright (admitted *pro hac vice*)
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
Facsimile: (617) 937-2400
E-mail:ewright@cooley.com

Aneel L. Chablani (No. 6242658)
Ami Gandhi (No. 6282924)
Clifford Helm (No. 6319229)
CHICAGO LAWYERS' COMMITTEE FOR CIVIL
RIGHTS
100 N. LaSalle St., Ste. 600
Chicago, IL 60602

Telephone: (312) 630-9744
Facsimile: (312) 630-1127
E-mail: achablani@clccrul.org
E-mail: agandhi@clccrul.org
E-mail: chelm@clccrul.org

Jon M. Greenbaum
Ezra D. Rosenberg
James T. Tucker
Ryan R.T. Snow
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, N.W. Suite 900
Washington, D.C. 20005

28

*Counsel for Plaintiffs Illinois State Conference of the NAACP and United Congress of Community and Religious Organizations*

Janette M. Louard
Anthony P. Ashton
Anna Kathryn Barnes
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

*Of Counsel for Plaintiff Illinois State Conference of the NAACP*